JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CHARLES M. SWEENEY, VINCENT E. LOMBARDO, and JAMES M. STEFL

**(b)** County of Residence of First Listed Plaintiff   Cumberland
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
A. RICHARD FELDMAN, BAZELON, LESS & FELDMAN, P.C.
ONE SOUTH BROAD STREET, SUITE 1500,
PHILADELPHIA, PA 19107    (215) 568-1155

### DEFENDANTS
RETIREMENT PLAN COMMITTEE OF TALEN ENERGY CORP., TALEN ENERGY RETIREMENT PLAN, TALEN ENERGY CORP., and TALEN ENERGY SUPPLY, LLC

County of Residence of First Listed Defendant   Lehigh
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☒ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 502(a) of ERISA, 29 U.S.C. 1132(a)
Brief description of cause:
Recover pension benefits unlawfully denied in violation of pension plan and statute

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE   09/19/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 02/19)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553   Brief Description: Unauthorized reception of cable service

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| CHARLES M. SWEENEY, et al., | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| RETIREMENT PLAN OF TALEN ENERGY CORP., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( x )

| September 19, 2019 | A. Richard Feldman | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 568-1155 | (215) 568-9319 | rfeldman@bazless.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)      The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)      In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)      The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)      Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)      Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _Charles M. Sweeney and Vincent E. Lombardo: Camp Hill, PA; James M. Stefl: Milton, PA_

Address of Defendant: _All Defendants:  600 Hamilton Street, Suite 600, Allentown, PA 18101_

Place of Accident, Incident or Transaction: _Allentown, PA_

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _09/19/2019_     _____     _41329_
                          *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* _____ ERISA _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

## ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ A. Richard Feldman _____, counsel of record *or pro se plaintiff*, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _09/19/2019_     _____     _41329_
                          *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES M. SWEENEY,<br>Camp Hill, PA | : |
| | : |
| VINCENT E. LOMBARDO,<br>Camp Hill, PA | : |
| | : |
| and | : |
| | : |
| JAMES M. STEFL,<br>Milton, PA | : |
| Plaintiffs, | :     CIVIL ACTION NO. |
| | : |
| v. | :     19- |
| | : |
| RETIREMENT PLAN COMMITTEE OF<br>TALEN ENERGY CORPORATION,<br>Allentown, PA | : |
| | : |
| TALEN ENERGY RETIREMENT PLAN,<br>Allentown, PA | : |
| | : |
| and | : |
| | : |
| TALEN ENERGY CORPORATION,<br>TALEN ENERGY SUPPLY, LLC,<br>Allentown, PA | : |
| | : |
| Defendants. | : |

## COMPLAINT

### INTRODUCTION

1.     Plaintiffs, all former long-term, senior management employees of a major energy

company, bring this action under ERISA to obtain the rightful pension benefits and supplements

they were denied by defendants.

2.     For more than 30 years, plaintiffs worked for Pennsylvania Power and Light

("PPL"), a utility company, in various engineering positions.  Under the PPL Retirement Plan,

1

employees like plaintiffs were eligible for "unreduced" early retirement pension benefits if PPL underwent a "Change in Control" ("CIC"), such as a sale or merger, and the new owner subsequently eliminated their jobs.[1]

3.      During the period 2014-2016, PPL and a private equity firm, Riverstone Holdings LLC ("Riverstone"), engaged in a two-step transaction under which PPL spun off parts of its power generating business to a newly created entity – Talen Energy Corporation and its wholly-owned subsidiary Talen Energy Supply LLC (referred to collectively herein as "Talen Energy"). Despite plaintiffs' long and dedicated service to the business, and their undisputed experience and skills, Talen Energy targeted the positions of these older employees for termination shortly after the second and final stage of the sale was finalized in December 2016.

4.      As a result, Plaintiffs Charles M. Sweeney, Vincent E. Lombardo, and James M. Stefl, all of whom were under the age of 60, were compelled to accept a severance package and retire years earlier than each had planned. Nonetheless, due to the Change in Control, each became entitled to, and should have received, unreduced early retirement pension benefits and pension supplements – that is, full retirement benefits without the aged-based reductions that plans impose on those whose benefits commence before reaching "normal" retirement age as defined by the Plan (in this case, age 60).

5.      These rights were guaranteed to plaintiffs by three different sources: the terms of the Talen Energy Retirement Plan adopted by successor employer Talen Energy (the "Talen Energy Plan" or "the Plan"); certain contractual obligations assumed by Talen Energy as part of the transactions between PPL and Talen Energy; and the provisions of the Employee Retirement

---

[1] Put simply, the term "Change in Control" refers to a significant change in a corporation's ownership or control, such as occurs in a merger or acquisition. As defined in this case, the Change in Control made plaintiffs eligible for certain unreduced early retirement pension benefits, as explained further below.

Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, including ERISA's "anti-cutback rule," which strictly prohibits reduction or elimination of accrued early retirement pension benefits.

6.      Instead of honoring these obligations, however, Talen Energy, the Talen Energy Retirement Plan, and the Retirement Plan Committee of Talen Energy ("the Committee" or the "Plan Committee") all acted in concert to conceal and/or misrepresent their benefits obligations to plaintiffs and others.  Defendants did this despite an express declaration by Talen Energy's own Board of Directors that the Change in Control provisions of the Talen Plan had in fact been triggered.

7.      Under ERISA, defendants had a strict fiduciary duty to inform the plaintiffs and other similarly situated PPL-heritage employees whom they terminated regarding their Change in Control pension rights.  Defendants chose to disregard that duty.

8.      Plaintiff Charles M. Sweeney only learned of the Change in Control provisions when he stumbled upon a cryptic reference to them while engaging in his own independent internet research.  Sweeney then applied for payment of the unreduced CIC pension benefits that were due to him under the Plan.

9.      Defendants, acting through the defendant Plan Committee, responded to Plaintiff Sweeney.  In their response, they denied the benefits by ignoring the clear terms of the Plan as well as the declaration by their own Board of Directors that a Change in Control had in fact occurred.  Defendants also concocted a bad faith, supposed "interpretation" that purported to nullify the CIC provisions.

10.      As a result of defendants' acts and failure to notify eligible terminated employees of their rights in violation of their strict ERISA fiduciary duties, the other two Plaintiffs –

3

Lombardo and Stefl – were not even aware of the Change in Control provisions upon retiring. Consequently, they did not seek these unreduced benefits as part of their pensions.

11.     Defendants' violations deprived each plaintiff of substantial lump sum pension benefits.  Plaintiffs Sweeney and Lombardo were deprived of approximately $120,000 each, while Plaintiff Stefl lost approximately $285,000. In addition, defendants deprived plaintiffs of pension supplements (discussed further below) ranging from approximately $63,000 to $75,000 for each of them.

## JURISDICTION AND VENUE

12.     This Complaint arises under Section 502(a) of ERISA, 29 U.S.C. § 1132(a).  The Court has subject matter jurisdiction over this action under Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), and under 28 U.S.C. § 1331.  In addition, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by Section 502(a) of ERISA, 29 U.S.C. § 1132(a).

13.     Venue is proper in this district under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district; the breaches and violations of law occurred in this district; and defendants reside, do business and are found in this district.  Venue also is proper in this district under 28 U.S.C. § 1391(b), because the acts and omissions that give rise to plaintiffs' claims occurred in this district.

## PARTIES

14.     Plaintiff Sweeney began his employment with PPL in 1986 and held various engineering and management jobs at PPL and Talen Energy during the ensuing 30 years.  His last position was as Relay Test Supervisor at the Brunner Island Power Plant located in York Haven, Pennsylvania.  On December 9, 2016, three days after the closing of the sale to Riverstone Holdings, Mr. Sweeney was formally told that his job was being eliminated and that he was being

forced out with a severance package at the age of 57.  By letter dated December 29, 2016, Mr. Sweeney applied for his pension lump sum payment, including the unreduced early retirement pension and supplements payable under the CIC provisions.  By letter dated March 28, 2017, defendant Plan Committee denied these pension benefits.  Plaintiff Sweeney thereafter initiated a timely appeal to the Plan Committee, which denied his appeal by letter dated December 29, 2017. Following the completion of these claim proceedings, Plaintiff Sweeney commenced his reduced pension effective as of March 1, 2018.  Mr. Sweeney resides in Camp Hill, Pennsylvania.

15.     Plaintiff Vincent E. Lombardo began his employment with PPL in 1982 and held various senior engineering and management jobs at PPL and Talen Energy during the ensuing 35 years.  His last position was as Senior Engineer – FGD and Plant Chemistry at the Brunner Island Power Plant located in York Haven, Pennsylvania.  On or about April 3, 2017, approximately 3½ months after the closing of the sale to Riverstone Holdings, Mr. Lombardo was told that that his job was being eliminated and that he was being forced out with a severance package at the age of 58.  As noted above, defendants concealed from Plaintiff Lombardo the availability of the unreduced CIC pension benefits, and he was therefore unaware of their existence.  Within days of learning of his termination in April 2017, he applied for his pension lump sum payment.  His retirement was effective June 1, 2017.  Mr. Lombardo resides in Camp Hill, Pennsylvania.

16.     Plaintiff James M. Stefl began his employment with PPL in 1982 and held various senior engineering and management jobs at PPL and Talen Energy during the ensuing 35 years. His last position was as Work Management Supervisor at the Brunner Island Power Plant located in York Haven, Pennsylvania.  On or about April 3, 2017, approximately 3½ months after the closing of the sale to Riverstone Holdings, Mr. Stefl was told that his job was being eliminated and that he was being forced out with a severance package at the age of 57.  Like Plaintiff

Lombardo, Plaintiff Stefl was not informed of, and was therefore unaware of, the existence and availability of the CIC pension benefits. Within days of learning of his termination in April 2017, Mr. Stefl applied for his pension lump sum payment. His retirement was effective August 1, 2017. Mr. Stefl resides in Milton, Pennsylvania.

17.     All three plaintiffs are vested participants of the Plan, within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7).

18.     Defendant Retirement Plan Committee of Talen Energy Corporation is the "Plan Administrator" of the Plan within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A). It is also a "named fiduciary" of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a), as well as a "fiduciary" of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). The Plan Committee is legally responsible for administering the Plan in conformity with its terms, with the controlling provisions of ERISA and with the Internal Revenue Code. The individual members of the Committee are senior executives of defendant Talen Energy who were appointed by its Board of Directors. The identities of the individual members of the Committee, other than Russell R. Clelland and Karla A. Durn, are not currently known to plaintiffs. However, the Committee members will be added as defendants upon receipt of identifying information.

19.     Defendant Talen Energy Retirement Plan is a defined benefit "pension benefit plan" within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2). The purpose of the Plan is to provide post-retirement income to employees of Talen Energy and its subsidiaries, and their beneficiary spouses and other eligible dependents. The Plan is the successor plan to the PPL Plan and is obligated to maintain the PPL Plan benefits under ERISA and under contractual obligations of Talen Energy.

20.     Defendant Talen Energy Supply LLC is a Delaware corporation with a place of business at 600 Hamilton Street, Allentown, Pennsylvania, 18101.  Talen Energy Supply is the formal sponsor of the Plan and also a "fiduciary" of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  As noted above, Talen Energy Supply is a wholly-owned subsidiary of defendant Talen Energy Corporation, a Delaware corporation which has a place of business at the same address, and the two defendants are referred to collectively as "Talen Energy." The benefit reductions and eliminations,  and the breaches of fiduciary duty that lie at the heart of this action were planned, orchestrated and effectuated by Talen Energy through the executives who sat on the defendant Plan Committee and carried out those actions. In committing these ERISA violations, Talen Energy and the Plan Committee members were assisted by Talen Energy's outside legal counsel, including attorney Barry L. Klein.

## FACTUAL BACKGROUND

**A.     PPL's Sale of Power Businesses to Talen Energy.**

21.     In or about 2013, PPL's management determined that it would be advantageous to spin off and divest certain power generation plants and other assets of its power-generating businesses in the Mid-Atlantic region, principally in Pennsylvania.

22.     According to PPL's SEC Form 8-K Report filed June 12, 2014, PPL, Talen Energy Holdings, Inc., Talen Energy Corporation, PPL Energy Supply, LLC, and other acquisition-related entities entered into a Separation Agreement, a Transaction Agreement, and an Employee Matters Agreement on June 9, 2014.  Pursuant to the first two agreements, PPL agreed to spin off the business of PPL Energy Supply to PPL's shareowners, and to immediately combine that business with the merchant power generation businesses of companies affiliated with Riverstone.  The product of these steps was to be named Talen Energy Corporation with wholly owned subsidiaries including Talen Energy Supply.

23.     The initial spin-off closed and became effective on June 1, 2015.  According to its SEC Form 8-K Report dated June 1, 2015, Talen Energy was formed when PPL spun off its competitive power generation business and immediately combined it with the competitive generation business owned by Riverstone, a private equity firm.  Upon completion of those 2015 transactions, PPL shareholders owned 65 percent of Talen Energy's common stock; the other 35% was owned by affiliates of Riverstone.  Paul A. Farr, who had been President and Chief Executive Officer of PPL Energy Supply, LLC, assumed the same positions at Talen Energy, leading "an experienced Talen Energy management team that has decades of experience in power generation, commercial operations and corporate strategy."  *Id.*

24.     According to the June 1, 2015 8-K Report, at the time of the closing in June 2015, Talen Energy owned about 15,000 megawatts of generating capacity, primarily located in two of the largest, most transparent and most liquid competitive power markets in the United States: PJM (Mid-Atlantic) and ERCOT (Texas).  On a pro-forma basis, the assets comprising Talen Energy generated annual revenue of $4.3 billion in 2014.

25.     Subsequently, in November and early December 2015, Riverstone communicated to Talen Energy's Board of Directors its interest in acquiring Talen Energy's outstanding shares – which were not beneficially owned by Riverstone – for $11.00 per share in cash (later increased to $14.00).  This represented a premium of approximately 45%.  These sale negotiations culminated in an Agreement and Plan of Merger, dated June 2, 2016, and a tender offer to Talen shareholders by means of a proxy statement dated September 2, 2016.  This second transaction with Riverstone closed on December 6, 2016.

**B.      Talen Energy Was Obligated to Provide the Same Pension Benefits Under the Successor Talen Energy Retirement Plan as Had Existed Under the Predecessor PPL Retirement Plan.**

26.     The predecessor PPL Retirement Plan provided a number of valuable and protected

early retirement pension benefits which had accrued to plaintiffs (and other senior PPL-heritage employees).

### 1. The Employee Matters Agreement.

27.    As part of the first transaction with Riverstone, on or about June 9, 2014, PPL, Talen Energy, and the other acquisition-related entities entered into an "Employee Matters Agreement." This Agreement governed the treatment of employees who would be affected by the transaction, including their pension and other employment benefits. Section 2.2 of the Employee Matters Agreement became effective upon the spin-off of PPL Energy Supply on June 1, 2015. It required the preservation of all forms of employee benefits for plaintiffs and other PPL-heritage employees. The Agreement specifically provided that "For a period of at least twenty-four (24) months following the [June 1, 2015] Separation Date, Newco [*i.e.,* Talen Energy] shall provide . . . to each Energy Supply Employee" substantially similar severance benefits, retirement benefits, and other employee benefits:

> (a)    For a period of at least twenty-four (24) months following the Separation Date, NewCo shall provide or shall cause to be provided to each Energy Supply Employee (i) a base salary and a bonus opportunity that are no less favorable in aggregate value than the base salary and bonus opportunity provided to such Energy Supply Employee immediately before the Separation Date, (ii) eligibility to participate in a severance benefit arrangement that provides potential severance benefits that are no less favorable in aggregate value than the severance benefits provided under the severance benefit arrangement, if any, set forth in Section 5.11(a) of the Parent Disclosure Letter in which such Energy Supply Employee is eligible to participate immediately before the Separation Date and (iii) other compensation and employee benefits that are substantially similar in the aggregate to the other compensation and employee benefits provided to such Energy Supply Employee immediately prior to the Separation Date (it being understood that one type of compensation or benefit may be substituted for another as long as compensation and employee benefits are substantially similar in the aggregate), except in each case, as necessary to comply with applicable Law; provided, however, that this Section 2.2(a) shall not apply to any Union Employee, whose terms and conditions of employment shall be governed by any applicable Collective Bargaining Agreement. [Employee Matters Agreement § 2.2.]

## 2. The Merger Agreement.

28.     In addition to the Employee Matters Agreement, as part of the second transaction with Riverstone, on June 6, 2016, Talen Energy and the acquisition-related entities entered into an "Agreement and Plan of Merger."  Section 5.11 of the Merger Agreement, which became effective upon the consummation of the transaction on December 6, 2016, likewise provided for the continuation and preservation of all pension and other benefits.  The Merger Agreement also expressly provided that the transaction would be deemed to constitute a "Change in Control" for purposes of all employee benefit plans.  The relevant provisions are as follows:

**Section 5.11 Employee Matters**.

(a)     From the Effective Time through the twelve (12) month anniversary of the Effective Time (the "Continuation Period"), with the exception of employees represented by any labor organization, Parent shall provide, or shall cause to be provided, to each employee of the Company and its Subsidiaries (including the Surviving Corporation and its Subsidiaries) as of the Effective Time (each such employee not represented by a labor organization, a "Company Employee" [sic]), for so long as the Company Employee is employed by the Surviving Corporation or any of its Subsidiaries during the Continuation Period, . . . (ii) employee benefits (excluding, for the avoidance of doubt, incentive compensation and retiree welfare benefits) that are no less favorable in the aggregate than the same provided to such Company Employee immediately prior to the Effective Time.

\* \* \* \*

(c)     From and after the Effective Time, Parent shall, or shall cause the Surviving Corporation and its Subsidiaries, to assume and honor all Company Plans in accordance with their terms as in effect immediately before the Effective Time and **the Transactions shall be deemed to constitute a "change in control", "change of control" or "corporate transaction", as applicable, under such Company Plans**.  [Merger Agreement at § 5.11(a) (emphasis added)]

The Merger Agreement defines "Company Plans" to include "each employee benefit plan under ERISA" and "each other material employee benefit or compensation plan" including "retirement plan . . . [or] defined benefit plan."  (Merger Agreement at 83.)  The Proxy Statement recites that the Merger Agreement was unanimously approved and adopted by Resolution of the

"Disinterested" members of the Board of Directors at the Board meeting on June 2, 2016. (*See* Definitive Proxy Statement, dated September 2, 2016, at 8, 26).

29.    Defendant Plan Committee acknowledged Talen Energy's legal obligations to continue paying pension and other benefits.   Two days after the second transaction with Riverstone, Talen Energy acted through the Plan Committee and adopted Amendment No. 5 to the Plan.  Amendment No. 5 was dated December 8, 2016 but retroactively effective to June 1, 2015, which was the original effective date of the Talen Plan.  This Amendment recites that, "the [Talen Energy Retirement] Plan originated as a spin-off from the PPL Retirement Plan and is, therefore, required under law to preserve all benefits, rights and features of the PPL Retirement Plan." Amendment No. 5 further stated that the Plan was "legally required in order to preserve all benefits rights and features to which participants are entitled."  It also proceeded to restore to the Plan an omitted sub-provision of PPL Plan Section 5.3(a)(3) applicable to unionized employees.  However, Amendment No. 5 failed to restore other sub-provisions applicable to plaintiffs, as explained in paragraph 52 below.

**C.    The Plan Provides Unreduced Early Retirement Pensions to Participants Whose Employment Is Terminated After a Change in Control.**

30.    Section 5.3(a)(3) of the Talen Energy Plan – which preserves the benefits due under PPL Plan Section 5.3(a)(4) – states that a management employee "whose employment is terminated by a Participating Company within three years after a Change in Control and who has an Early Retirement Date under [the provision defining  a Change in Control]" is entitled to "an unreduced annual pension, payable monthly, equal to the Participant's Accrued Benefit as of his Early Retirement Date."

31.    Section 1.13(b) of the Talen Energy Plan provides the following definition for a "Change in Control":

(b)(1)  "Change in Control" means the occurrence of any one of the following events:

(i)  the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, on the date hereof, constitute the Board of Directors of Talen Energy Corporation and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of Talen Energy Corporation[ )[2]] whose appointment or election by the Board of Directors of Talen Energy Corporation or nomination for election by Talen Energy Corporation's shareowners was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(ii)  any Person becomes the beneficial owner (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Talen Energy Corporation representing 20% or more of the combined voting power of Talen Energy Corporation's then outstanding securities entitled to vote generally in the election of directors;

(iii)  there is consummated a merger or consolidation of Talen Energy Corporation or any direct or indirect subsidiary of Talen Energy Corporation with any other corporation or other entity, other than (A) a merger or consolidation which would result in the voting securities of Talen Energy Corporation outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof), in combination with the ownership of any trustee or other fiduciary holding securities under an employee benefit plan of Talen Energy Corporation or any subsidiary of [sic – words omitted – should read "Talen Energy Corporation"], at least 60% of the combined voting power of the securities of Talen Energy Corporation or at least 60% of the combined voting power of the securities of such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or (B) a merger or consolidation effected to implement a recapitalization of Talen Energy Corporation (or similar transaction) in which no Person is or becomes the beneficial owner, directly or indirectly, of securities of Talen Energy Corporation (excluding in the securities beneficially owned by such Person any securities acquired directly from Talen Energy Corporation or its Affiliates) representing 20% or more of the combined voting power of Talen Energy Corporation's then outstanding securities;

---

[2]  This provision as it appears in the Talen Energy Plan was incorrectly transcribed.  The missing close parenthesis appears here in the parallel provision § 1.12(b)(1) of the predecessor PPL Retirement Plan.

(iv)  the shareowners of Talen Energy Corporation approve a plan of complete liquidation or dissolution of Talen Energy Corporation; or

(v)  the Board of Directors of Talen Energy Corporation adopts a resolution to the effect that a "Change in Control" has occurred or is anticipated to occur.

(2)  Notwithstanding the foregoing, the occurrence of one or more of the events set forth in Paragraph 1.13(b)(1)(i), (iii) or (iv) shall not constitute a Change in Control if the initial public disclosure relating to such event including any proposal with respect thereto, is made jointly by Talen Energy Corporation and the Person effecting or proposing to effect a "Change in Control." [Talen Energy Retirement Plan, June 1, 2015, at I-4 to I-6.]

32.     Under these Change in Control provisions, an employee is eligible to receive, throughout his or her retirement, and commencing as early as age 55, 100% of his/her then accrued pension benefit with no actuarial reduction for early commencement.  In the absence of these CIC benefits, the pension benefits of a retiring participant would be reduced by 8% for each year before the retiree reached the age of 60.

33.     As a direct result of defendants' violations, each of the three plaintiffs was severely affected by these unlawful reductions.  Sweeney and Lombardo each saw his pension benefits cut by 14.89%.  Stefl's reduction was even more severe – 24%.  Translated into dollars, the lump sum pension amounts were unlawfully reduced by $116,580 for Sweeney, by $125,054 for Lombardo, and by $285,290 for Stefl.

**D.     Plaintiffs Satisfied the Conditions for the Change in Control Unreduced Pension Benefits.**

34.     Each plaintiff lost his employment within three years of a Change in Control.  The other conditions for triggering plaintiffs' CIC benefits were likewise satisfied, under several different subparts of the CIC definitions.

a.      Section 1.13(b)(1)(i).  The December 6, 2016 stage 2 acquisition by Riverstone constituted a Change in Control under subsection (i) of Section 1.13(b)(1).  The

individuals who were serving "on the date hereof," *i.e.*, the June 2015 adoption date of the Plan, or were subsequently seated on the Board, ceased to constitute a majority of the Board of Directors of Talen Energy.   Talen's Form 14A Proxy Statement for the Riverstone acquisition, dated September 2, 2016, at pages 114-116, identified 8 individuals who had been serving as Talen directors since June 2015.  Talen's SEC Form 8-K filing, dated December 6, 2016, states in Item 5.02 that, "Effective upon completion of the Merger" four listed individuals, including existing directors Alexander and Hoffman who had been seated in June 2015 by Riverstone, "became the directors of the Company."  But, the remaining six out of eight directors, equal to 75% of Talen's pre-existing directors, ceased to serve as directors:   "As a result of the Merger, Frederick M. Bernthal, Edward J. Casey, Jr., Philip G. Cox, Paul A. Farr [the CEO, *see* below], Louise K. Goeser and Stuart E. Graham are no longer directors of the Company."   The departure of six out of eight directors from the Board constitutes a departure of more than a majority of the Board. Consequently, a Change in Control within the meaning of Section 1.13(b)(1)(i) occurred as a result of the December 6, 2016 acquisition by Riverstone.

   b. <u>Section 1.13(b)(1)(ii)</u>.  The December 6, 2016 acquisition by Riverstone also constituted a Change in Control under subsection (ii) of Section 1.13(b)(1).  That provision is satisfied when "any Person becomes the beneficial owner (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Talen Energy Corporation representing 20% or more of the combined voting power of Talen Energy Corporation's then outstanding securities."  The Committee took the position that this provision was not satisfied "because the Riverstone entities did not become 20% owners of Talen as a result of the December 6, 2016 transaction" – they actually became owners of an *additional* 65% of Talen shares.  (Committee March 28, 2017 letter at 2.)  This determination ignored the plain wording of the Talen Energy

Plan.  The Plan does not limit subsection (ii) to instances when a person "*first* becomes the beneficial owner" of 20% of the combined voting power.  Rather, it requires nothing more than acquisition of 20% or more of the combined voting power.  There is no condition based on the previous level of ownership.  As stated in the December 6, 2016 press release on page 1, Riverstone at that time acquired "approximately" 65% of the voting shares of Talen Energy.  This is more than sufficient to meet the threshold of 20% under Section 1.13(b)(1)(ii), and a Change in Control occurred for this reason as well.

      c.     Alternatively, if Section 1.13(b)(1)(ii) were read as looking only to the first time an entity acquired a 20% ownership stake in the business, then the original June 2015 combination between Riverstone and Talen Energy also satisfied this requirement.  The June 3, 2016 press release establishes that immediately following the spin-off of PPL Energy Supply as "Talen Energy" on the June 1, 2015 Closing Date, Riverstone affiliates acquired "approximately 35%" of the Talen common stock, with the remaining 65% continuing to be held by pre-existing owner PPL.  Talen's Form 8-K filed on June 2, 2015 stated in Item 5.01, entitled "Changes in Control of the Registrant," that "Immediately following the completion of "the spin-off of PPL Energy Supply, "65% of Talen Energy's common stock is owned by PPL shareowners and the remaining 35% is owned by RJS, affiliates of Riverstone."  That event likewise constituted a Change in Control under subsection (ii) of Section 1.13(b)(1).

      d.     Section 1.13(b)(1)(iii).  The December 6, 2016 acquisition by Riverstone also constitutes a Change in Control under subsection (iii) of Section 1.13(b)(1).  Subsection (iii) is satisfied when "there is consummated a merger or consolidation" of Talen Energy with any other corporation or entity.  As stated in the Form 8-K dated December 6, 2016, item 2.01, the acquisition completed a "merger" whereby Talen Energy became a private entity.  "Each share of common

stock" of Talen Energy "was cancelled," trading was halted, and the company was delisted on the NYSE (item 3.01).  The former shareholders of Talen Energy did not receive shares in a new entity.  Rather, they received cash payments for their shares.[3]

      e.    Section 1.13(b)(1)(v).  This section requires only that "the Board of Directors of Talen Energy Corporation adopt a resolution *to the effect that* a 'Change in Control' has occurred or is anticipated to occur" (emphasis added).  As stated in paragraph 28 above and in paragraphs 35-39 below, the Talen Energy Board of Directors by resolution adopted the Merger Agreement, which expressly stated that the transaction constituted a "Change in Control" for all employee benefit plans.  Despite this express Board declaration, the Committee once again ignored the terms of the Plan, by imposing an additional condition that is not present in the Plan.  According to the Committee, since "the Committee was never directed by a Board resolution to treat the December 6, 2016 transaction as a 'Change in Control' for purposes of the Plan," subsection (v) of Section 1.13 (b)(1) could not be satisfied.  But nothing in the Plan requires the Board's resolution to refer to the Plan by name or to "direct" the Plan or Committee to do anything.  The Committee's newly-manufactured requirement of a resolution that includes an express "direction" to the Committee therefore has no basis in the Plan's provisions.  Rather, the Plan says plainly – and broadly – that any resolution of the Board of Directors declaring a Change in Control has occurred or is anticipated to occur, or otherwise including a statement "*to the effect that* a 'Change in Control' has occurred or is anticipated to occur" will satisfy the requirements of Section 1.13(b)(1)(v).  The Board of Directors did exactly that by signing the Merger Agreement and

---

[3]  The exceptions set forth in subsections A and B of Section 1.13(b)(iii) are inapplicable here.  Subsection A is not applicable because the shareholders holding 60% of the combined voting power of Talen Energy securities did not "continue to represent at least 60% of the combined voting power of the securities of such surviving entity."  The exception in subsection B is inapplicable because the December 2016 Riverstone acquisition did not "implement a recapitalization" in which no person became the owner of at least 20% of the combined voting power of Talen Energy.

adopting it by Board resolution.

35.    As further evidence of defendants' bad faith "interpretation," the Committee produced in response to Sweeney's document requests during his claim appeal (and pursuant to the fiduciary exception to the attorney-client privilege) a March 10, 2017 Memorandum to the Committee from outside counsel Barry L. Klein.   It acknowledged that "the Board has the discretion to declare by resolution that a Change in Control exists for purposes of the Plan for any reason." (March 10, 2017 Memorandum at 6).   The Klein memorandum then attaches and describes portions of the Merger Agreement with Riverstone "which the Committee should consider." Attorney Klein describes the provision as follows:

> Section 5.11(c) of the Merger Agreement [quoted in Complaint ¶ 28 above] provides that "[Riverstone] shall, or shall cause [Talen] to assume and honor all Company [Employee Benefit] Plans . . . and **the Transaction shall be deemed to constitute a 'change in control', 'change of control' or corporate transaction as applicable under such Company Plans."** Presumably, the Board adopted the entire Merger Agreement by resolution and therefore **it would be disingenuous to suggest that there is no evidence that the Board invoked or did not invoke Section 1.13(b)(1)(v).** [Klein March 10, 2017 Memorandum at 6 (emphasis added).]

36.    The Merger Agreement defines "Company Plans" to include "each employee benefit plan under ERISA" and "each other material employee benefit or compensation plan" including "retirement plan . . . [or] defined benefit plan." (Merger Agreement at 83, attached to Klein memo as Tab 5.)

37.    Further, the Proxy Statement for this second transaction in 2016 recites that the Merger Agreement was unanimously approved and adopted by Resolution of the "Disinterested" members of the Board of Directors at the Board meeting on June 2, 2016.  (*See* Definitive Proxy Statement, dated September 2, 2016, at 8, 26).

38.    In addition, Talen Energy filed a Form 8-K on December 6, 2016.  The Form 8-K states in Item 5.01, under the title "Changes in Control of Registrant," as follows: "As a result of

the Merger, a change in control of the Company occurred, and the Company is now a wholly owned subsidiary of the Sponsor Entities.  The Sponsor Entities are affiliated with investment funds advised by Riverstone [Holdings LLC]."

39.   The December 6, 2016 Form 8-K also states in Item 5.02 that the Board of Directors through its Compensation Committee acted on December 1, 2016 to amend the "performance unit award agreements" for Talen CEO and Director Paul A. Farr and three other senior Talen executives.  This amendment, which is attached to the Form 8-K as Exhibit 10.3, added a new Section 7 to the agreements.  New Section 7 provided that, "upon consummation of the transaction contemplated by the Merger Agreement" with Riverstone, Farr and the other executives would receive a cash payment "equal to the . . . total number of shares of Company common stock that would be delivered to the Participant upon a Change in Control pursuant to Section 2(c) herein" times $14.00.[4]  The amendment states further that "capitalized terms [such as "Change in Control" are] set forth in the Participant's Change in Control Agreement."   The Change in Control Agreement for Mr. Farr is set out in the Talen Energy Corp. Form 8-K filed on January 15, 2016. This filing recites in Item 5.02 that Mr. Farr, as a PPL-heritage employee, was party to a particular form of PPL Change in Control ("CIC") Agreement.  It goes on to note that the Employee Matters Agreement which became operative upon the Talen spinoff from PPL effective June 1, 2015 requires preservation for PPL employees of all forms of benefits for a period of two years.  The January 15, 2016 Form 8-K then states that the Change in Control Agreement for Mr. Farr contains a particular definition of Change in Control and proceeds to enumerate the five prongs of this definition more or less verbatim.  The definition of a CIC that appears in Mr. Farr's CIC Agreement is the same as the CIC definition found in Section 1.13 of the Talen Plan applicable to Plaintiffs

---

[4]  Mr. Farr's Performance Unit Agreement was not reproduced in the SEC filings and the Committee unlawfully denied access to it during the Sweeney claim proceedings.

Sweeney, Lombardo and Stefl.

40.     This equivalence is not surprising, because under both Section 5.11 of the Merger Agreement and Section 2.2 of the Employee Matters Agreement, Talen was obligated to replicate the terms of the PPL Retirement Plan for plaintiffs, Mr. Farr, and other PPL-heritage employees. The terms of the PPL CIC Agreement applicable to Mr. Farr accordingly used the same definition as the qualified retirement plans, the PPL Retirement Plan and the Talen Energy Retirement Plan.

41.     These SEC filings prove a crucial fact – the Talen Board of Directors approved the payment to Mr. Farr of a number of CIC pension benefits under the Plan.  It also approved payment to Farr of "non-qualified" executive pension and other benefits, including severance and incentive payments.  All of this was based upon the fact that a Change in Control had occurred – a Change in Control that was determined using **the very same definition of a CIC that applies to plaintiffs under Section 1.13 of the Talen Energy Retirement Plan.**

**E.       The Exceptions to § 1.13(b)(i) and (iii) Are Not Applicable Here.**

42.     Under the Plan, plaintiffs are entitled to the CIC benefits, including unreduced early retirement pensions and pension supplements, if they satisfy any or all of the CIC definitions.  The defendant Retirement Plan Committee, however, strained to manufacture a way around these entitlements.  In the Committee's letters denying Plaintiff Sweeney's claim for unreduced benefits, the Committee asserted that Section 1.13(b)(2) of the Plan applied.  Under Section 1.13(b)(2), the Committee asserted, subsections (i) and (iii) of the CIC definitions (discussed above, relating to changes in directors and to mergers/consolidations respectively) were carved-out and unavailable because the initial public disclosure of the 2016 transaction with Riverstone Holdings was (supposedly) "made jointly by Talen Energy Corporation and the [other party to the transaction]." For this assertion of a joint press release, the Committee relied solely upon a June 3, 2016 Talen Energy press release.

19

43.     This agreement is self-defeating.  On its face, the June 3, 2016 Talen Energy press release was not a "joint press release."  The Committee's conclusion was erroneous for at least the following four reasons:

       a.     the only corporate logo on the press release is Talen's logo;

       b.     the only contact persons listed at the beginning and end of the press release are Talen Energy personnel located in Allentown, PA;

       c.     the issuing location is "Allentown, PA" where Talen Energy alone is located; and

       d.     the press release states in the very first sentence that "Talen Energy Corporation (NYSE: TLN) . . . announced today . . .."

44.     As further evidence of the Committee's bad faith, the Committee's decision letter to Mr. Sweeney enclosed a copy of the June 3, 2016 press release that was incomplete.  A comparison with the version of this press release found on Talen Energy's own website reveals a significant addition – at the end of the text on the final page, the website version says: "SOURCE Talen Energy Corporation."  The same four words appear on the version of the press release published by Talen Energy on the PR Newswire website.

45.     The history of the initial Talen Energy spin-off further demonstrates that when these companies jointly issued a press release, they were very clear about its joint nature.  On June 9, 2014, PPL issued a press release concerning the initial transaction planned with the Riverstone entities.  It began with the following statement:  "PPL Corporation (NYSE: PPL) and Riverstone Holdings LLC, a leading energy and power investment firm, announced Monday (6/9) a definitive agreement to combine."  As one would expect, that joint release also identified media contacts at both PPL and Riverstone and referred readers to both the PPL and Riverstone websites.

20

46.    Here, by contrast, there was no mention of two parties issuing a joint statement; there was just a press release issued solely by defendant Talen Energy.

47.    Accordingly, contrary to the Plan Committee's assertions, the exclusion stated in Section 1.13(b)(2) has no application here and the Plan Committee therefore had no justification for treating subsections (i) and (iii) of the CIC definitions as though they had been nullified as sources of unreduced early retirement pension benefits.

48.    As Talen Energy's own Board of Directors expressly determined and resolved, the existence of a Change in Control cannot be disputed.

**F.    Plaintiffs Also Are Entitled to Unreduced Early Retirement Benefits Even If No Change In Control Occurred.**

49.    As described above (¶ 27), Section 2.2 of the Employee Matters Agreement required the preservation for PPL-Heritage employees like plaintiffs of all forms of benefits for a period of at least two years.  The June 2016 Merger Agreement likewise required preservation of these benefits (¶ 28), as did Section 204(g) of ERISA, 29 U.S.C. § 1054(g).

50.    Plaintiffs were in fact all terminated within two years of those agreements.

51.    In violation of the Agreements and ERISA, the Talen Plan omitted several provisions that had been part of the PPL Retirement Plan, under which Plaintiffs and other PPL-heritage employees were entitled to unreduced early retirement pension benefits.

52.    The PPL Retirement Plan had provided in Section 5.3(a)(3)(D) that plaintiffs were entitled to unreduced early retirement benefits, without regard to whether or not a Change in Control had occurred.   This benefit entitlement was based upon their execution of a separation/severance agreement and release pursuant to company policy for displaced managers:

(D)  A Participant who qualifies for benefits pursuant to PPL's Displaced Manager's Policy (SPM Policy 606) or PPL's Policy on Loss of Qualifications (SPM Policy 607), and who executes a severance agreement and release as specified by a Participating Company.  [PPL Retirement Plan, § 5.3(a)(3)(D); *see*

*also* PPL Plan Appendix F.]

Pursuant to its contractual obligations under the two Agreements, Talen Energy continued the same policy and severance program and likewise should have preserved and thus included this alternative provision for unreduced pensions in the successor Talen Energy Plan. But, as drafted by defendants, the Talen Energy Plan failed to include any portion of Section 5.3(a)(3)'s provisions for unreduced pensions. Instead, defendants omitted this subsection in its entirety, in violation of both the Agreements and ERISA.

53.     Each plaintiff (along with other similarly situated PPL-heritage employees) was provided job termination severance benefits under the successor Talen Energy version of the cited PPL employment policies, including the Talen Energy Severance Benefits Plan, and each signed a "Separation Agreement and General Release." Defendants nevertheless unlawfully deprived plaintiffs of unreduced early retirement pension benefits by omitting Section 5.3(a)(3)(D) from the Talen Energy Plan. These benefits were not conditioned upon a Change in Control.

**G.     In Addition to Unreduced Pension Benefits, Plaintiffs Were Also Unlawfully Deprived of Pension Supplements to Which They Were Entitled.**

54.     Plaintiffs were not limited under the PPL Retirement Plan to unreduced pension benefits. They were also eligible to receive pension supplements. The PPL Retirement Plan had provided temporary pension supplements in Section 5.3(b) to any participant "who satisfies the criteria set forth in [PPL Plan] Subsection 5.3(a)(3)(C), (D), or (E) or 5.3(a)(4) above." These supplements provided (a) a monthly supplement of not more than $1,000 per month, beginning with the month the participant retires through the month he/she attains eligibility for reduced Social Security benefits (age 62). The PPL Plan had further provided for a second monthly supplement of not more than $250 per month, starting with the month the participant attains eligibility for reduced Social Security benefits (age 62) through the month the participant becomes entitled to

receive unreduced Social Security benefits (age 66+).   Based on plaintiffs' birthdates and final compensation, these pension supplements should have totaled $72,000 for Plaintiff Sweeney, $63,000 for Plaintiff Lombardo, and $75,000 for Plaintiff Stefl.

55.   In violation of its duties, Talen Energy eliminated these pension supplement benefits.  It did so by omitting from § 5.3(b) all references to (1) the cited parts of § 5.3(a)(3), and (2) the former PPL § 5.3(a)(4).   Unlike Section 5.3(b) of the PPL Plan quoted in the preceding paragraph, Section 5.3(b) as incorporated into the new Talen Plan mistakenly refers to former PPL Plan § 5.3(a)(*5*), which was renumbered in the Talen Plan as § 5.3(a)(4).  That provision deals with participants who are terminated between the ages of 45 and 54, a group which was not entitled to supplements under the PPL Plan.  The provisions that had been set forth in § 5.3(a)(4) of the PPL Plan – and which Talen Energy was obligated to carry-over to its new plan – were different – they provided pension supplements that were intended to help tide over participants age 55 and over who retire due to a Change in Control and who are approaching, but not yet eligible for, Social Security payments.  These 55 and older participants had been covered by the original PPL Plan § 5.3(a)(4), but the Talen Plan drafters mistakenly referred to the wrong subsection.

56.   The reference in Section 5.3(b) of the Talen Plan to § 5.3(a)(4) is a transcription error that occurred when the PPL Plan was copied to create the Talen Energy Plan effective in June 2015.  The PPL Plan did *not* provide income supplements to those whose retirements were at ages 45-54 under PPL Plan § 5.3(a)(5), which is the renumbered provision that now appears in the Talen Plan as § 5.3(a)(4).  The drafting mistake occurred when the Talen Plan drafter copied the language of the PPL Plan, deleted the references to all parts of subsection 5.3(a)(3) which consequently were not carried over to the new Talen Plan, and renumbered from that point – without taking into account that PPL § 5.3(a)(4) now appeared in the Talen Plan as § 5.3(a)(3) and

that the correct reference in Section 5.3(b) therefore should be to § 5.3(a)(3), the provision for unreduced pensions upon a change in control for those who are age 55 and older, such as plaintiffs. This obvious drafting error is the subject of Count Four below.[5]

57.     Because the Talen Plan unlawfully omitted PPL Plan Section 5.3(a)(3)(D) which would have been applicable to plaintiffs, defendants also eliminated this alternative basis for plaintiffs' pension supplements.  In the event that the mis-numbering found in Section 5.3(b) of the Talen Energy Plan is not corrected, either voluntarily by defendants or by the Court, then the omission of PPL Plan Section 5.3(a)(4) from the successor Talen Plan also is unlawful for the reasons stated in Count Three below.

**H.     Defendants Concealed the Existence and Availability of the CIC Benefits.**

58.     Notwithstanding the legally protected status of the CIC benefits at the time of the Riverstone transactions completed in June 2015 and December 2016, defendants misrepresented and concealed from plaintiffs and other eligible employees both the existence and availability of these CIC benefits.

59.     Upon learning in November 2016 that his position was going to be eliminated, Plaintiff Sweeney requested pension-related information and documents from the human resources staff at Talen.  The staff supplied a copy of the summary plan description and an incomplete copy of the formal plan document on December 19, 2016.  The SPD failed to disclose the existence or the terms of the CIC benefits.  As noted above, Sweeney discovered the CIC benefits only by happenstance, when he came across a copy of the first IRS Annual Report Form 5500 for the Talen Energy Plan on the website of the U.S. Department of Labor.  That filing included a summary of

---

[5] A similar scrivener's error appears in Section 5.3(a), which in three places mistakenly refers to the early retirement provisions of "Section 1.12" (the correct section of the predecessor PPL Plan) instead of Section 1.13 (the corresponding correct section of the Talen Energy Plan).

key plan provisions prepared by the Plan's actuary.  Even though ERISA mandates disclosure of key documents, defendants did not respond to Sweeney's request for a complete copy of the formal plan document, including all amendments, until the Committee included it with their March 28, 2017 claim denial letter, which Sweeney received on March 30, 2017.

COUNT ONE

**VIOLATION OF THE TERMS OF THE TALEN ENERGY RETIREMENT PLAN**

60.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 59. This Count is brought by each plaintiff against defendants the Committee and the Plan.

61.     Each plaintiff was entitled to receive an unreduced early retirement pension under the terms of Talen Plan Section 5.3(a)(3) and the terms of the unlawfully omitted PPL Plan Section 5.3(a)(3)(D).

62.     In addition, defendants violated the terms of the Talen Plan by denying to each plaintiff the monthly pension supplements payable under Section 5.3(b) of the PPL Plan.  As explained above, these benefits were available to plaintiffs because of their entitlement to receive unreduced early retirement pensions under both (a) the provisions of PPL Plan § 5.3(a)(4), which were carried over in § 5.3(a)(3) of the Talen Energy Plan, and (b) the omitted provisions of PPL Plan § 5.3(a)(3)(D).  Due to the obvious drafting error in preparing the new Talen Energy Retirement Plan, the wrong section of the PPL Plan was referenced in the new plan document.  In the event that defendants do not correct this error, then the Court should do so through its power to fashion declaratory and injunctive relief.  Alternatively, plaintiffs seek reformation of the Plan to correct this obvious scrivener's error in Count Four below.

63.     Alternatively, defendants' failure to continue the pension supplements as applicable to plaintiffs in the Plan violated the Plan terms which were added by the Employee Matters Agreement and the Merger Agreement quoted in paragraphs 27-28 above.  Under established Third

Circuit precedent, the provisions of these documents dealing with pension benefits constitute enforceable amendments to the Plan. These agreements were in writing, contained provisions directed to the ERISA plans, including the Plan, and satisfied the Plan's procedures for adoption of amendments "by or pursuant to action of [the Company's] board of directors." The pension supplement benefits therefore are incorporated as part of the Plan by virtue of the Employee Matters Agreement and the Agreement and Plan of Merger, without regard to the obvious drafting error which unlawfully omitted the benefits for participants who, like plaintiffs, qualified for unreduced pensions.

64.     In violation of their duties to pay plaintiffs all benefits due to them, defendants the Committee and the Plan engaged in bad faith and did not faithfully carry out the terms of the Plan. To the contrary, defendants ignored plan terms, afforded them a tortured and false "interpretation," and otherwise abused their discretion.

65.     Defendants also treated plaintiffs in an arbitrary and unfaithful manner by denying CIC benefits to them while providing the same benefits, governed by the same plan terms and definitions, to former CEO Paul Farr and possibly other favored executives.

66.     Plaintiffs are entitled to (a) enforce their rights under the Plan and under ERISA and to clarify their rights to benefits, under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (b) secure other relief under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), as may be necessary and appropriate to fully and effectively remedy these violations. The same sections of ERISA are a basis for monetary, declaratory and equitable relief to fully remedy each of these violations.

## COUNT TWO

### VIOLATION OF ERISA FIDUCIARY DUTIES
### PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

67.     Plaintiffs incorporate paragraphs 1 through 59 by reference as though fully set forth herein.  This Count is brought by each plaintiff against defendants the Committee and Talen Energy.

68.     Defendants the Committee and Talen Energy at all relevant times were "fiduciaries" within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), with respect to the Plan and the matters complained of herein.

69.     In performing their duties as fiduciaries of the Plan, defendants failed to discharge the strict fiduciary duties imposed on them by Section 404(a) of ERISA, 29 U.S.C. § 1104(a), to:

a.     act with utmost loyalty to, and solely in the interest of, the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to them;

b.     act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person skilled and expert in the profession of plan administration would use in the conduct of an enterprise of a like character and with like aims;

c.     disclose material information to those to whom their fiduciary duties were owed, including plaintiffs, regarding the CIC benefits available to them under the Plan;

d.     ensure that the administration of the Plan complied with the law; and

e.     conduct all benefit claim proceedings with utmost loyalty to the participants while scrupulously avoiding any form of bad faith or other wrongdoing to promote corporate interests.

70.     Under well-established Supreme Court and Third Circuit precedent, the strict fiduciary duty to accurately and clearly communicate all material benefits information to

participants includes the duty to inform participants about benefits to which they may be entitled, even if they do not inquire about, or apply for, these benefits. In this case, Plaintiffs Lombardo and Stefl never learned of the CIC benefits due to defendants' fiduciary violations. As a result of these violations, these plaintiffs were harmed and should be deemed to have applied for, and been denied, the CIC benefits for purposes of all claims in this case.

71.     In further violation of their strict fiduciary duties, defendants also (a) failed to continue, and failed on a continuing basis to correct the omission of, valuable pension benefits from the PPL Plan as required by ERISA and the transaction agreements; (b) adopted and implemented illegitimate, tortured "interpretations" of Plan provisions; and (c) engaged in bad faith during the claim and appeal proceedings for Plaintiff Sweeney, including their unjustified, repeated denials of his rights to obtain documents relevant to this claim, as required under ERISA and its claim regulation. All plaintiffs have been harmed by these violations.

72.     Each of these forms of conduct constituted breaches of fiduciary duty and violated Section 404(a) of ERISA, 29 U.S.C. § 1104(a). In addition, defendants Talen Energy and the Committee and its individual members are "co-fiduciaries" and are jointly liable for all breaches committed by each other fiduciary defendant under Section 405 of ERISA, 29 U.S.C. § 1105, because each defendant (a) knowingly participated in, or knowingly undertook to conceal, acts or omissions of one or more other fiduciaries, knowing such acts or omissions were a breach; (b) enabled one or more other fiduciaries to commit a fiduciary breach by failing to comply with its own fiduciary duties in the administration of its specific responsibilities giving rise to its status as a fiduciary; and/or (c) knew of a breach by one or more other fiduciaries but failed to make reasonable efforts under the circumstances to remedy the breach.

73.     Plaintiffs are entitled under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), to

28

enforce their rights under ERISA and secure appropriate monetary, declaratory and equitable relief to fully remedy each of these violations.

74.     Plaintiffs are also entitled to further equitable relief, including entry of an Order requiring an accounting by defendants of all profits and savings to the Plan and to Talen Energy attributable to their fiduciary violations; other surcharges on defendants; and all forms of monetary relief to make plaintiffs whole for all losses and harms caused by the fiduciary violations.

## COUNT THREE

### ILLEGAL CUTBACK AND ELIMINATION OF ACCRUED PENSION BENEFITS IN VIOLATION OF SECTION 204(g) OF ERISA

75.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 59. This Count is brought by each plaintiff against defendants the Committee and Talen Energy.

76.     The Talen Energy Retirement Plan document unlawfully omitted the basis for unreduced early retirement benefits that was provided under § 5.3(a)(3)(D) of the PPL Plan. Despite defendants' recognition in December 2016 that the omission of other portions of § 5.3(a)(3) violated their legal duty to continue benefits as stated in paragraph 26 above, defendants did nothing to remedy their unlawful omission of § 5.3(a)(3)(D) of the PPL Plan, even when the violation was brought to their attention by Plaintiff Sweeney through his benefit claim and appeal.

77.     The benefit provided under § 5.3(a)(3)(D) of the PPL Plan is an accrued pension benefit, early retirement benefit, and/or retirement-type subsidy within the meaning of ERISA's "anti-cutback" provision, Section 204(g) of ERISA, 29 U.S.C. § 1054(g), applicable regulations, and case law.  Section 204(g)(1) provides that, "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."  Under established Third Circuit precedent, the termination and replacement of a pension plan constitutes an "amendment" of the plan which triggers the protections of Section 204(g).

29

78.     In addition, under Third Circuit precedent, defendants' unsupported reading and bad faith "interpretation" of the CIC provisions generally, including Section 1.13(b), likewise constitutes a prohibited "amendment" of the plan which triggers the protections of Section 204(g). Defendants were prohibited from purporting to interpret the CIC provisions in a manner which denied to plaintiffs the unreduced early retirement benefits due to them under Talen Plan § 5.3(a)(3).

79.     ERISA Section 204(g)(2) further provides that an amendment that eliminates or reduces an early retirement benefit or retirement-type subsidy "with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." Even if defendants had been permitted by the Agreements to prospectively eliminate the unreduced pension benefits, the accrued portion of the CIC benefits attributable to plaintiffs' service as of the June 1, 2015 effective date of the Talen Energy Retirement Plan could not be eliminated or reduced by defendants.

## COUNT FOUR

### REFORMATION OF THE TALEN ENERGY PLAN TO CORRECT THE SCRIVENER'S ERROR OMITTING THE PENSION SUPPLEMENT BENEFITS

80.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 59. This Count is brought by each plaintiff against all defendants.

81.     ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes the Court to issue monetary, declaratory and equitable relief to fully remedy the violations of plaintiffs' rights. The monthly pension supplements that had been available to plaintiffs under PPL Plan §§ 5.3(a)(4) and 5.3(b) were required to be continued for plaintiffs in the successor Talen Energy Plan pursuant to the Employee Matters Agreement and the Merger Agreement. In addition, the omission of these benefits from the Talen Energy Plan was the result of an obvious scrivener's error in failing to

account for the re-numbering of subsections from the carried-over PPL Plan.

82.     Under established Supreme Court and Third Circuit precedent, "The jurisdiction of equity to reform written instruments, where there is a mutual mistake, *or mistake on one side and fraud or inequitable conduct on the other*, is undoubted . . ." *Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892) (emphasis added).  "Power to reform written contracts for fraud or mistake is everywhere conceded to courts of equity."  *Ivinson v. Hutton*, 98 U.S. 79, 82 (1878).

83.     The Court accordingly should order a reformation of the Talen Energy Plan to correct the language of § 5.3(b) to include reference to the unlawfully omitted provisions of Talen Plan § 5.3(a)(3).

## COUNT FIVE

### PENALTIES UNDER ERISA § 502(c)(1) FOR FAILURE TO PROVIDE PLAN DOCUMENTS TO PLAINTIFF SWEENEY WITHIN 30 DAYS OF HIS REQUEST

84.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 59. This Count is brought by Plaintiff Sweeney against defendants the Committee and the Plan.

85.     Section 502(c)(1) of ERISA, 29 U.S.C. § 1132(c)(1), provides that a plan administrator "who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant . . . by mailing the material requested to the last known address of the requesting participant . . . within 30 days after such request may in the court's discretion be personally liable to such participant . . . in the amount of up to $100 a day from the date of such failure or refusal."  The documents and information which a plan administrator is required to furnish upon request to a participant include the summary plan description for a plan and the full plan document for a plan.  ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).

86.     During a meeting with Talen HR Manager Sharon Rhodes on November 28, 2016,

Plaintiff Sweeney requested a copy of the summary plan description and full plan document for the Plan. The mandatory 30-day period to mail (or email) these documents to Sweeney expired on December 28, 2016. Sweeney did not receive the full plan document including all amendments until March 30, 2017, when he received the Committee's March 28, 2017 letter denying Sweeney's claim for unreduced CIC pension benefits which included the full plan as an enclosure. This delay in providing the Plan amendments constitutes a default of 92 days.

87.     Defendants therefore are liable to pay to Plaintiff Sweeney penalties of $9,200.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray as follows:

A.     That the Court declare, adjudge and decree that:

(1)     each plaintiff is entitled to receive an unreduced early retirement pension under the terms of Plan § 5.3(a)(3);

(2)     defendants unlawfully deleted PPL Plan § 5.3(a)(3)(D) and each plaintiff is also entitled to receive an unreduced early retirement pension under the terms of that alternative provision;

(3)     defendants mistakenly and/or unlawfully deleted Talen Plan § 5.3(a)(3) and PPL Plan §5.3(a)(3)(D) as bases to receive the pension supplements provided in Plan § 5.3(b) and each plaintiff is entitled to receive the pension supplements under those provisions; and

(4)     defendants the Committee and Talen Energy violated their strict fiduciary duties under ERISA Section 404(a) by omitting protected pension benefits from the Plan, by misrepresenting and concealing the terms and availability of the CIC benefits from plaintiffs and other participants, and by conducting the claim proceedings for Plaintiff Sweeney in bad faith.

B.      That the Court enter an order reforming the Talen Energy Retirement Plan in a manner which:

(1)      restores all unlawfully and/or mistakenly omitted benefit provisions; and

(2)      strikes-out all provisions which are inconsistent with the Court's ruling on the provisions which must be included in the Plan by operation of law or the terms of the transaction agreements preserving benefits.

C.      That the Court order and enjoin all defendants to:

(1)      take all necessary and effective steps, including special notices, to inform all active, separated and retired Plan participants of the existence of, and their possible entitlement to, the CIC and PPL Plan § 5.3(a)(3)(D) unreduced early retirement pension benefits and supplements;

(2)      review through a Court-appointed independent fiduciary all previously determined pension benefit applications to identify all other participants who have been improperly denied these benefits;

(3)      issue corrected summary plan descriptions and benefits estimates which clearly and conspicuously inform participants of the availability of these benefits; and

(4)      make full and prompt retroactive and future payments of all such benefits to plaintiffs and all other eligible participants.

D.      That the Court enter such other remedial and injunctive relief, including appointment of one or more independent fiduciaries to conduct all future claim proceedings, as may be necessary to ensure that defendants' violations are fully remedied and that appropriate

procedures are established to prevent any further acts purporting to reduce or eliminate, or to misrepresent or conceal, protected pension benefits in a manner contrary to the requirements of ERISA;

    E.  That the Court award monetary relief to each plaintiff to:

       (1)  restore the principal amounts of the benefits unlawfully denied to him;

       (2)  surcharge the earnings and other profits garnered by each defendant as a result of their violations and withholding of benefits from plaintiffs and other participants; and

       (3)  restore the investment earnings and other returns that each plaintiff would have realized if the unlawfully withheld benefits had been correctly paid at the time of their pension applications and retirements.

    F.  That the Court award to plaintiff Sweeney the maximum possible penalties for the Committee's violation of its duty under ERISA to promptly provide requested Plan documents;

    G.  That the Court award plaintiffs and their counsel reasonable costs and expenses, pre- and post-judgment interest, and attorneys' fees; and

    H.  That the Court grant such other relief as may be just and proper.

    Respectfully submitted,


    /s/ Alan M. Sandals
    Alan M. Sandals
    PA Bar ID No. 36044
    **SANDALS & ASSOCIATES, P.C.**
    4 Green Hill Road
    P.O. Box 385
    Washington Depot, CT  06794
    (860) 868-1140

/s/ A. Richard Feldman
A. Richard Feldman
PA Bar ID No. 41329
**BAZELON LESS & FELDMAN, P.C.**
One South Broad Street
Suite 1500
Philadelphia, PA 19107
(215) 568-1155

*Counsel for Plaintiffs*

Dated:  September 19, 2019